**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| 01 COMMUNIQUE LABORATORY, INC., | ) ) | CASE NO. 1:06-cv-253 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| CITRIX SYSTEMS, INC., et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Plaintiff 01 Communique Laboratory, Inc. ("plaintiff" or "01" or "Communique") brought this action on February 1, 2006, alleging that defendants Citrix Systems, Inc. and Citrix Online, LLC (collectively "defendants" or "Citrix"), infringe U.S. Patent No. 6,928,479 (the '479 patent"). (Doc. No. 294-1 ['479 patent"]). Now pending before the Court are multiple motions filed by both parties. The motions fall into two categories—infringement and eligibility of asserted claims of the '479 patent under 35 U.S.C. § 101 ("101").

With respect to infringement, Communique moves for summary judgment of: (a) direct infringement, and (b) exclusion of prior art raised during reexamination. (Doc. Nos. 346 and 346-1 ["Pltf. Infr. Motion"].) Citrix opposes Communique's infringement motion and moves for summary judgment on plaintiff's claims for: (a) willful infringement, (b) induced infringement, and (c) injunctive relief. (Doc. Nos. 354 and 355 ["Deft. Infr. Motion"].) Communique filed a reply in support of its motion and in

opposition to Citrix's motion (Doc. No. 376 ["Pltf. Infr. Reply"]), and Citrix filed a reply in in support of its motion (Doc. No. 385 ["Deft. Infr. Reply"]).

With respect to the parties' motions under § 101, Citrix moves for summary judgment that the asserted claims of the '479 patent are patent ineligible under § 101. (Doc. Nos. 347 and 347-1 ["Deft. § 101 Motion"].) Communique opposes Citrix's § 101 motion and also moves for summary judgment that the asserted claims are patent eligible under § 101. (Doc. Nos. 352 and 353 ["Pltf. § 101 Motion"].) Citrix filed a reply in support of its § 101 motion and in opposition to Communique's § 101 motion (Doc. No. 375 ["Deft. § 101 Reply"]), and Communique filed a reply in support of its § 101 motion. (Doc. No. 386 ["Pltf. § 101 Reply"]).

For the reasons that follow, Citrix's motion for summary judgment that the asserted claims of the '479 patent are ineligible under § 101 is denied, and Communique's motion for summary judgment that the asserted claims are eligible under § 101 is granted.

Further, for the reasons that follow, Communique's motion for summary judgment of direct infringement is denied, and Communique's motion exclusion of prior art references raised during reexamination is denied.

Citrix's motion for summary judgment on Communique's claims for willful infringement and injunctive relief is denied, and Citrix's motion for summary judgment on Communique's claim for induced infringement is granted.

# I. BACKGROUND

## A. The '479 Patent

The '479 patent is owned by Communique, and the claimed invention is a "system, computer product and method for providing a private communication portal"[1] through which individuals may remotely access a personal computer from a remote computer using a locator server acting as an intermediary between the personal and remote computers. ('479 patent, Col. 13:48-Col. 14:15.) The dispute in this infringement action revolves around the manner in which that remote access occurs.

When first filed in 2006, this case was before United States District Court Judge Ann Aldrich. While before Judge Aldrich, Citrix requested reexamination of the '479 patent by the United States Patent and Trademark Office ("USPTO"), arguing that the patent was invalid based on obviousness and anticipation with respect to certain prior art references. (Doc. No. 282-2 (Request for Inter Partes Reexamination ["Reexam. Req."]).) The reexamination request did not include the issue of patent eligibility under § 101. The '479 patent was not invalidated as a result of the USPTO's reexamination, and Citrix's petition was dismissed. (Doc. No. 230-2.).

## B. Third Amended Complaint and Claim Construction

After the reexamination petition was dismissed and the case was assigned to this Court, Communique filed a second, and then a third, amended complaint (Doc. No. 294 ["3d Am. Compl."].) In the third amended complaint, Communique claims that

---

[1] Abstract of '479 patent at 9262. All references to page numbers are to the page identification number generated by the Court's electronic docketing system.

3

Citrix's product, GoToMyPC, infringes one or more claims of the '479 patent, and that defendants have induced others to infringe the patent. In addition to damages, Communique seeks a permanent injunction against defendants prohibiting infringement of the '479 Patent. (3d Am. Compl. at 9258-59.) Citrix filed a counterclaim, seeking a declaration that defendants have not infringed, and do not infringe or actively induce others to infringe the '479 Patent. Citrix also seeks a declaration that the asserted claims of the '479 patent are invalid and/or unenforceable because the claims fail to satisfy one or more of the conditions for patentability specified in 35 U.S.C. §§ 101 *et seq*. (Doc. No. 308 ["Counterclaim"] at 10466-67.).

The Court concluded that it was required to consider the impact, if any, of the '479 patent reexamination upon the earlier claim construction issued by Judge Aldrich. Accordingly, the Court ordered claim construction briefing, conducted a *Markman* hearing, and issued its claim construction opinion. (Doc. No. 343 ["CC Op."].).

## II. DISCUSSION

### A. Summary Judgment Standard

It is well-established that "[s]ummary judgment is as appropriate in a patent case as in any other. Where no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law, the court should utilize the salutary procedure of Fed. R. Civ. P. 56[.]" *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 835 (Fed. Cir. 1984).

4

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if its resolution affects the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. *Id.* "A critical factor in a motion for summary judgment in a patent case, as in any other, is the determination by the court that there is no *genuine* issue of *material* fact." *Barmag Barmer*, 731 F.2d at 835 (emphasis in original).

The moving party must provide evidence to the Court which demonstrates the absence of a genuine dispute as to any material fact. Once the moving party meets this initial burden, the opposing party must come forward with specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Anderson*, 477 U.S. at 250. The nonmoving party may oppose a summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex*, 477 U.S. at 324. The Court must view all facts and evidence, and inferences that may be reasonably drawn therefrom, in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).

General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Summary judgment requires that a plaintiff present more than a scintilla of evidence to demonstrate each element of a prima facie case." *Garza v. Norfolk S. Ry. Co*., 536 F. App'x 517, 519 (6th Cir. 2013) (citing *Van Gorder v. Grand Trunk W. R.R.*, 509 F.3d 265, 268 (6th Cir. 2007)). "'The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 252).

The district court's review on summary judgment is a threshold inquiry to determine whether there is the need for a trial due to genuine factual issues that must be resolved by a finder of fact because those issues may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003).

Summary judgment is required

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the nonmoving party has failed to

make a sufficient showing of an essential element of [his] case with respect to which [he] has the burden of proof.

*Celotex,* 477 U.S. at 322-23 (internal quotation marks and citation omitted).

The typical summary judgment standard of review "poses unique issues" when cross motions for summary judgment are filed. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001). When cross motions are filed, the district court must evaluate each party's motion on its own merits, drawing all reasonable inferences against the moving party. *Id.* (citation omitted). If it is possible to draw inferences in either direction, then both motions for summary judgment should be denied. *Id.* at 592-93. The making of contradictory claims on summary judgment does not mean that if one is rejected the other must be accepted. *Id.*

## B. 35 U.S.C. § 101 and *Alice*

Before analyzing the summary judgment motions on the infringement issues, the Court must first decide the parties' cross motions on the issue of patent eligibility under § 101. "Patent eligibility under § 101 is an issue of law[.]" *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015) (citing *In re BRCA1– & BRCA2–Based Hereditary Cancer Test Patent Litig.,* 774 F.3d 755, 758 (Fed. Cir. 2014)). Important to the Court's analysis is the Supreme Court's recent decision regarding patent eligibility under § 101—*Alice Corp. Pty. Ltd., v. CLS Bank Int'l.*, —U.S.—, 134 S. Ct. 2347, 189 L. Ed. 2d 296 (2014).

35 U.S.C. § 101 provides that:

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

**1. § 101 analysis under *Alice***

There are three exceptions to § 101's broad description of patent eligible subject matter: laws of nature, natural phenomena, and abstract ideas. *Alice,* 134 S. Ct. at 2354 ("We have long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable.") (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.,* 569 U.S. ——, ——, 133 S. Ct. 2107, 2116, 186 L. Ed. 2d 124 (2013)); *Bilski v. Kappos,* 561 U.S. 593, 601, 130 S. Ct. 3218, 177 L. Ed. 2d 792 (2010). The purpose of the exception is to prevent monopolization of the "basic tools of scientific and technological work" that would impede further innovation. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, —U.S.—, 132 S. Ct. 1289, 1293, 182 L. Ed. 2d 321 (2012).

But the Supreme Court recognized that,

[a]t some level, "all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." [*Mayo,* 132 S. Ct., at 1293]. Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept. *See Diamond v. Diehr,* 450 U.S. 175, 187, 101 S. Ct. 1048, 67 L. Ed. 2d 155 (1981). "[A]pplication[s]" of such concepts "'to a new and useful end,'" we have said, remain eligible for patent protection. *Gottschalk v. Benson,* 409 U.S. 63, 67, 93 S. Ct. 253, 34 L. Ed. 2d 273 (1972).

*Alice,* 134 S. Ct. at 2354 (alterations in original); *Diehr,* 450 U.S. at 187 ("[A]n *application* of a law of nature or mathematical formula to a known structure or process

8

may well be deserving of patent protection.") (emphasis in original) (citation omitted).

The Supreme Court in *Alice* utilized the two-part framework set forth in *Mayo* for distinguishing patents that claim laws of nature, natural phenomena, or abstract ideas from patent eligible claims. *Id.* at 2355. The first step is to "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* at 2355 (citing *Mayo*, 132 S. Ct. 1296-97). If the claim is not directed to one of the three patent ineligible concepts, no further analysis is required—the claim is patent eligible under § 101. But if the claim is directed to an abstract idea, the Court must undertake the second step of *Mayo* to determine whether the elements of a claim, "both individually and 'as an ordered combination,'" contain "additional elements" that "transform the nature of the claim into a patent-eligible application" of an abstract idea. *Id.* at 2355 (citing *Mayo*, 132 S. Ct. at 1297-98).

This second step involves a search for the "inventive concept"—"an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* at 2355 (citing *Mayo*, 132 S. Ct. 1294) (alteration in original).

*Alice* made clear that the mere introduction of a computer into a claim, or the recitation of generic computer functions, to perform an abstract idea does not turn an abstract idea into a patent eligible claim. *Id.* at 2357-58 (collecting cases). "[I]f a patent's recitation of a computer amounts to a mere instruction to [implement the abstract idea on the computer] that addition cannot impart patent eligibility." *Id.* at 2358 (quoting *Mayo*, 132 S. Ct. at 1301) (internal quotation marks and citation omitted).

9

## 2. Presumption of validity and burden of proof

Before undertaking the § 101 analysis, the Court must first address the parties' dispute whether a presumption of validity and burden of proof by clear and convincing evidence applies to the parties' cross motions regarding patent eligibility under § 101. This is not a simple issue.

35 U.S.C. § 282(a) provides that a patent and each claim of a patent "shall be presumed valid[,]" and "[t]he burden of establishing invalidity of a patent or any claim therefor shall rest on the party asserting such invalidity."[2] Defenses involving the validity of a patent, including § 101, must be pleaded. *See* 35 U.S.C. § 282(b)(2).[3]

Communique contends that the '479 patent is entitled to a presumption of validity, and Citrix's § 101 defense, as with other invalidity defenses, must be proved by clear and convincing evidence. (Pltf. § 101 Motion at 13097 (citing *Ultramercial, Inc., v.*

---

[2] 35 U.S.C. § 282(a):

> A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

[3] 35 U.S.C. § 282(b):

> (b) Defenses**.**--The following shall be defenses in any action involving the validity or infringement of a patent and shall be pleaded:
>
> (1) Noninfringement, absence of liability for infringement or unenforceability.
>
> (2) Invalidity of the patent or any claim in suit on any ground specified in part II as a condition for patentability.
>
> * * *
>
> 35 U.S.C. § 101 (Inventions Patentable) is contained within Part II—Patentability of Inventions and Grant of Patents. Also contained within Part II is § 102 (novelty) and § 103 (non-obvious subject matter).

*Hulu LLC*, 722 F.3d 1335 (Fed Cir. 2013)).) In *Ultramercial*, applying a presumption of validity and burden of clear and convincing evidence on the defendant asserting invalidity under § 101, the Federal Circuit found that an Internet and computer based method for monetizing copyrighted products was eligible for patent protection. *Ultramercial,* 722 F.3d at 1342 (presumption of validity and clear and convincing standard applies to § 101 eligibility challenges) (citing *Microsoft Corp. v. i4i Ltd. P'ship*, —U.S.—, 131 S. Ct. 2238, 2242, 180 L. Ed. 2d 131 (2011)). But the Supreme Court vacated the decision in *Ultramercial*, and remanded the case to the Federal Circuit for further consideration regarding patent eligibility under § 101 in light of *Alice*. *Wildtangent, Inc. v. Ultramercial*, *LLC*, —U.S.—, 134 S. Ct. 2870, 189 L. Ed. 2d 828 (2014). On remand, the Federal Circuit concluded that the patent claims were not directed to patent eligible material, but did not readdress the burden of proof. Judge Mayer filed a concurring opinion, which included a lengthy explanation for his position that no presumption of eligibility applies to a § 101 inquiry. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718-21 (Fed. Cir. 2014) (Mayer, J., concurring).

Before *Alice* was decided by the Supreme Court, it was the subject of an en banc decision in which a divided Federal Circuit affirmed the district court's decision that the patent at issue was ineligible under § 101, and this en banc decision was cited by *Ultramercial*, discussed above. *CLS Bank Intern. v. Alice Corp. Pty. Ltd.,* 717 F.3d 1269 (2013) (en banc). The en banc per curiam decision consisted of one paragraph, with a total of five concurring and dissenting opinions.

11

With respect to the burden of proof in a § 101 analysis, Judge Lourie, writing a concurring opinion for himself and four other judges, stated that "it bears remembering that all issued patent claims receive a statutory presumption of validity. 35 U.S.C. § 282; [*Microsoft*, 131 S. Ct. 2238]. And, as with obviousness and enablement, that presumption applies when § 101 is raised as a basis for invalidity in district court proceedings." *Id*. at 1284 (Lourie, J. concurring) (citations omitted). Chief Judge Rader, writing for himself and three other judges in an opinion concurring-in-part and dissenting-in-part, also stated that "[b]ecause we believe the presumption of validity applies to all challenges to patentability, including those under Section 101 and the exceptions thereto, we find that any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence." *Id*. at 1304-05 (Rader, C.J. concurring-in-part and dissenting-in-part) (citing *Microsoft*, 131 S. Ct. at 2242). But there was no majority opinion and, as Judge Rader observed, "[t]hough much is published today discussing the proper approach to the patent eligibility inquiry, nothing said today beyond our judgment has the weight of precedent." *Id*. at 1292, n.1 (Rader, C.J. concurring-in-part and dissenting-in-part).

The Supreme Court in *Alice* affirmed the Federal Circuit's per curiam en banc decision, which consisted of a single paragraph, finding the patent at issue ineligible under § 101. But the Supreme Court was silent on the issues of presumption of validity and burden of proof in its § 101 analysis.

At this time, there is uncertainty in the law with respect to the presumption of validity and standard of proof in a § 101 analysis, and district courts across the country have gone both ways. *See e.g. Listingbrook, LLC v. Market Leader, Inc*., No. 1:13-cv-583, —F. Supp. 3d—, 2015 WL 7176455, at *5 (M.D. North Carolina Nov. 13, 2015) (collecting cases).

In *Microsoft*, the Supreme Court concluded that the invalidity defenses must be proved by clear and convincing evidence. *Microsoft*, 131 S. Ct. at 2242. This burden of proof flows from the presumption of validity in 25 U.S.C. 282(a). *Id.* at 2246. But evidentiary standards apply to questions of fact, not to questions of law. *Id.* at 2253 (Breyer, J. concurring) (citation omitted). Invalidity defenses often are mixed questions of fact and law. *See InTouch Techs., Inc. v. VGO Commc'ns, Inc.,* 751 F.3d 1327, 1339 (Fed. Cir. 2014) (obviousness is a mixed question of law and fact). "Where the ultimate question of patent validity turns on the correct answer to legal questions—what these subsidiary legal standards mean or how they apply to the facts as given—today's strict standard of proof has no application." *Microsoft*, 131 S. Ct. at 2253 (Breyer, J. concurring) (citations omitted). "Courts can help to keep application of [the] 'clear and convincing' standard within its proper legal bounds by separating factual and legal aspects of an invalidity claim[.] . . . By preventing the 'clear and convincing' standard from roaming outside its fact-related reservation, courts can increase the likelihood that discoveries or inventions will not receive legal protection where none is due." *Id*.

Section 101 is an invalidity defense under § 282. Federal Circuit precedent provides that § 101 eligibility is a question of law subject to de novo review. *OIP Techs. v. Amazon.com, Inc*., 788 F.3d 1359, 1362 (Fed. Cir. 2015) (citing *Accenture Global Srvs., GmbH, v. Guidewire Software, Inc.,* 782 F.3d 1336, 1340-41 (Fed. Cir. 2013)). But, "[t]his legal conclusion may contain underlying factual issues." *Listingbrook*, 2015 WL 7176455, at *6 (quoting *Accenture Global Servs.,* 728 F.3d at 1340-41).

In this Court's view, the most reasoned approach is to apply the clear and convincing evidentiary standard of proof to invalidity defenses under § 101 to the extent that analysis involves underlying factual issues, but not to the purely legal portion of the § 101 analysis. *Microsoft*, 131 S. Ct. at 2253 (Breyer, J. concurring); *see Listingbook*, 2015 WL 7176455, at *5-6, (citations omitted).

In this case, the issues before the Court with respect to the eligibility of the '479 patent under § 101 are purely legal. While the parties disagree how the limitations of claim 24 should be characterized in the context of the *Mayo* framework, those differences in this case do not constitute disputes of fact subject to an evidentiary standard of proof. *See Microsoft*, 131 S. Ct. at 2253 (Breyer, J. concurring).

## C. Analysis—35 U.S.C. § 101

### 1. The '479 patent and claim 24[4]

Citrix's argument that it is entitled to summary judgment that the '479 patent is patent ineligible under § 101 as a matter of law hinges on the *Alice* decision and

---

[4] The claims at issue in the third amended complaint are independent claim 24 and dependent claim 45. (*See* CC Op. at 11454.).

the Court's latest claim construction opinion, which concluded that claim 24 claims software.[5] But *Alice* was not the death knell of software patents. "[C]omputer software and codes remain patentable." *California Inst. of Tech. v. Hughes Commc'ns Inc*., 59 F. Supp. 3d 974, 990 (C. D. Calif. 2014) (discussing *Diehr*). According to Citrix, "[a]s construed, [Communique's] asserted claims usurp the abstract idea of an intermediary connecting two endpoints, and add nothing of a technical nature." (Deft. § 101 Motion at 12125.) "Applying the guidance of *Bilski, Mayo*, and *Alice* . . . we start [the § 101 analysis] by ascertaining the basic character of the subject matter, and then [by ascertaining] whether there is an 'inventive concept' in a claim drawn to some level of abstraction." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) (considering patent specification to understand basic character of claimed subject matter) (citing *Bancorp Srvcs., LLC v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273–74 (Fed. Cir. 2012) ("[T]he determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter.")); *Stoneeagle Srvs., Inc. v. Pay-Plus Solutions, Inc.*, Case No. 8:13-cv-2240-T-33MAP, —F. Supp. 3d—, 2015 WL 4042097, at *8 (M.D. Fla. 2015 Aug. 8, 2015) (considering patent's background sections to understand subject matter); *Enfish, LLC v. Microsoft, Corp*., 56 F. Supp. 3d 1167, 1173 (C.D. Ca. 2014) (To determine if a claim is directed to an abstract idea, "the court must identify the purpose of the claim—in other words, determine what the claimed invention is trying to achieve—and ask whether that purpose is abstract.").

---

[5] Deft. § 101 Motion at 12122, n.3.

15

The abstract in the '479 patent describes the invention as follows:

> A system, computer product and method for providing a private communication portal at a first computer connected to a network of computers includes a communication facility resident at the first computer, and a second computer including a locating facility for locating the current location of the first computer on the network, where the second computer facilitates communication between the first computer and third computer by authenticating the third computer for communication with the first computer and providing the location of the first computer for communication with the third computer.

('479 patent, at 9262.).

The '479 patent specification describes prior art systems for remote access, and lists specific disadvantages of such multi-user systems owned and operated by third-party intermediaries that are overcome by invention. ('479 patent, Col. 1:15-Col. 2:20.) As described in the specification, these disadvantages include: cost; lack of flexibility, customization, and access to personal data; cumbersome use; and replication of data from personal computer to third-party intermediary that raise privacy and security concerns. (*Id.*) In summary, the specification states that the invention addresses these problems by providing an easy-to use, inexpensive, private communication portal that does not require replication to a third-party intermediary to access data, and that provides greater customization flexibility and security. ('479 patent, Col. 2:21-Col. 4:22.).

The text of claim 24 is set forth in its entirety, below.

24.    A computer program product for use on a server computer linked to the Internet and having a static IP[6] address, for providing access to a personal computer from a remote computer, the personal computer being linked to the Internet, its location on the Internet being defined by either (i) a dynamic public IP address (publicly addressable), or (ii) a dynamic

---

[6] IP is the standard abbreviation for "Internet protocol."

LAN[7] IP address (publicly un-addressable), the computer program product comprising:

(a) a computer usable medium;

(b) computer readable program code recorded or storable in the computer useable medium, the computer readable program code defining a server computer program on the server computer wherein:

(i) the server computer program is operable to enable a connection between the remote computer and the server computer; and

(ii) the server computer program includes a location facility[8] and is responsive to a request from the remote computer to communicate with the personal computer to act as an intermediary between the personal computer and the remote computer by creating one or more communication sessions there between, said one or more communication sessions being created by the location facility, in response to receipt of the request for communication with the personal computer from the remote computer, by determining a then current location of the personal computer[9] and creating a communication channel between the remote computer and the personal computer,[10] the location facility being operable to create such communication channel whether the personal computer is

---

[7] LAN is the standard abbreviation for "local area network."

[8] The Court construed the term "location facility" to mean:

> Software on a locator server computer that: (1) receives a request for communication with the personal computer from a remote computer; (2) determines the then current location of the personal computer; (3) creates a communication channel between the remote computer and personal computer; and (4) creates one or more communication sessions between the remote computer and the personal computer. The locator server may comprise one or more computers, and the location facility may be distributed among one or more locator server computers.

(CC Op. at 11471.).

[9] The Court construed the term "determining the then current location of the personal computer" to mean: "determining a current address or communication session for communicating with the personal computer." (CC Op. at 11483-84.).

[10] The Court construed "creating a communication channel between the remote computer and personal computer to mean: "making or bringing into existence a communication channel between the remote computer and the personal computer." (CC Op. at 11486.).

linked to the Internet directly (with a publicly addressable) dynamic IP address or indirectly via an Internet gateway/proxy (with a publicly un-addressable dynamic LAN IP address).

('479 patent, Col. 13:48-Col. 14:15 (footnotes added).).

### 2. Abstract idea

The first step in the *Mayo* analysis it to determine whether the claim is directed to an abstract idea. The question of what constitutes an abstract idea is not an easy one, and the Supreme Court in *Alice* declined to "delimit the precise contours" of an abstract idea. *Alice*, 134 S. Ct. at 2357.

"At step one of the *Alice* framework, it is often useful to determine the breadth of the claims in order to determine whether claims extend to cover a 'fundamental . . . practice long prevalent in our system[.]'" *Capital One Bank*, 792 F.3d at 1369 (quoting *Alice*, 134 S. Ct. at 2356). In addition to fundamental practices long prevalent in our system, other examples of abstract ideas include algorithms, mathematical formulas, and conventional economic and business principles and practices, such as hedging risk and use of an intermediary;[11] methods equivalent to human mental work;[12] "[a]ge-old ideas [and] basic tools of research and development, like natural laws and fundamental mathematical relationships;"[13] methods of budgeting;[14] use of

---

[11] *Alice,* 134 S. Ct. at 2355-56 (citations omitted).

[12] *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2014).

[13] *California Inst. Tech.*, 59 F. Supp. 3d at 992) (citing *Ma*yo, 132 S. Ct. at 1296-97; *Bilski*, 561 U.S. at 611-12; *Benson*, 409 U.S. at 71-72).

[14] *Capital One Bank*, 792 F.3d at 1367-68.

advertising as currency;[15] guaranteeing a party's performance;[16] automated call distribution;[17] computerized telephone call routing system;[18] and customizing content based on information known about customer.[19]

    Citrix describes claim 24 as an abstract idea of an intermediary that, in response to a request for communication, finds a current location of the requested endpoint and creates a connection between the two devices, and argues that the invention could be, and was, performed by humans when telephone operators connected one caller to a second caller at the first caller's request. (Deft. § 101 Motion at 12126) (citing *Intellectual Ventures I LLC v. Symantec Corp.*, No. 10-1067-LPS, —F. Supp. 3d—, 2015 WL 1843528, at *9 (D. Del. Apr. 22, 2015) ("Another helpful way of assessing whether the claims of the patent are directed to an abstract idea is to consider if all of the steps of the claim could be performed by human beings in a non-computerized 'brick and mortar' context.") (citing *buySAFE*, 765 F.3d at 1353)). Citrix claims that Communique's expert, Dr. Gregory Ganger ("Ganger"), created this analogy himself during the reexamination process when explaining the "create" element of the claim. (Deft. § 101 Motion at 12127.).

---

[15] *Ultramericial*, 772 F.3d at 714.

[16] *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014).

[17] *Pragmatus Telecom. LLC v. Genesys* Telecomm, C.A. No. 14-cv-26, —F. Supp. 3d—, 2015 WL 4128963, at *5 (D. Del. July 9, 2015).

[18] *Comcast IP Holdings I, LLC v, Sprint Comm. Co., L.P.,* 55 F. Supp. 3d 544 (D. Del. 2014).

[19] *Capital One Bank*, 792 F.3d at 1369-70.

But an examination of Ganger's declaration shows Ganger did not use this analogy to describe the invention of the '479 patent, but that he used this analogy, along with other analogies, for the purpose of distinguishing the term "create" from the terms "use," "enables," and "facilitates" in clarifying that the location facility in the '479 patent creates the communication channel, and does not simply assist another component in creating the channel.[20]

Moreover, Citrix's analogy breaks down when claim 24 is considered as a whole, as *Alice* requires. *See also Symantec Corp.*, 2015 WL 1843528, at *9 (claim directed to an abstract idea if *all of the steps of the claim* could be performed by human

---

[20]

      8. In applying some references to the '479 Patent claims, the ACP essentially equates the word, "creates," with "uses", "enables", or "facilitates". One of ordinary skill in the art would not view the "create" requirements of the '479 Patent claims to be satisfied if the location facility is only "used" by some other component that itself creates the communication channel, as asserted in the ACP with respect to some references. One of ordinary skill in the art would also not view these "create" requirements to be satisfied if the location facility only "enables" or "facilitates" some other component that creates the communication channel, as asserted in the ACP with respect to some references. These words ("uses", "enables, "facilitates") would have different meanings to one of ordinary skill in the art than "create". Assisting some other component that creates the communication channel is not the same as creating the communication channel-the '479 Patent claims require the location facility to do the latter.

      9. In understanding the distinction, it is worth considering some analogies. For example, I sometimes (still) use a paper copy of the phone book to look up a phone number. Then, if I choose to, I dial the phone number to create the phone connection. Although I may use the phone book as an information source, one would not reasonably assert that the phone book "creates" the phone connection for me. As another example, consider the same process but replacing the paper phone book with a call to an information service (e.g., 4-1-1). If I call the information service, obtain a phone number, hang up, and dial the obtained phone number to create the phone connection, then one would again not reasonably assert that the information service "creates" the phone connection for me. As a third example, in contrast, consider a process by which I call an operator who makes the connection for me rather than giving me a number to dial myself. In this case, the operator does "create" the phone connection.

(Doc. No. 347-3 (Second Declaration of Gregory R. Ganger ["Second Ganger Dec."]) ¶¶ 8-9.).

beings in a non-computerized context). While an operator can connect callers, Citrix does not contend the operator could do so if the recipient of the call has a dynamic (changing) phone number that is unknown to the operator (publicly unaddressable IP address). In addition, the "then current location" of the personal computer in claim 24 is not simply the personal computer's current IP address—or telephone number in Citrix's analogy— but includes determining the then current "communication session for communicating with the personal computer." (CC Op. at 11483-84.) Finally, the purpose of claim 24, as reflected in the '479 patent specification, in creating the private communication channel for remote access is not simply to allow people to talk with each other, but to allow direct access of data on the personal computer from the remote computer. A telephone operator cannot and does not provide the caller with direct access to data on the callee's desk. Citrix oversimplifies the subject matter of the '479 patent and claim 24 in an attempt to characterize the invention as an abstract idea.[21]

---

[21] The defendants in *Contentguard Holdings, LLC v. Amazon.com, Inc*., —F. Supp. 3d—, Case No. 2:13– CV–1112–JRG, Case No. 2:14–CV–61–JRG, 2015 WL 5853984 (E.D. Texas Oct. 5, 2015), also attempted to oversimplify the patents in suit by analogizing the invention to a library loan. In *Contentguard,* the patents in suit are "generally directed toward systems and methods for controlling the use and distribution of digital works in accordance with 'usage rights' through use of 'trusted systems.'" *Id.* at *2. The defendants analogized the invention to a basic library loan that could be performed by humans without computers. *Id.* at *4. But the district court in *Contentguard* was not persuaded by the library analogy, and concluded that the patents were directed to "methods and systems of managing digital rights using specific and non-generic 'trusted' devices and systems." *Id.* Based on this analysis, the district court concluded that the patent was not directed to an abstract idea, but even if it were, the second step of the *Alice* analysis was satisfied because the patents disclosed "particular solutions" to the problem of enforcing usage rights to digital content, did not foreclose other ways of solving the problem, and recited a series of steps that depart from the "conventional" way of managing digital rights. *Id*. at *6 (citing *Internet Patents*).

Software patents are not all automatically directed to an abstract idea. *Ultramercial*, 772 F.3d at 715 ("[W]e do not purport to state that all claims in all software-based patents will necessarily be directed to an abstract idea."). The '479 patent and claim 24 are not merely directed to a broad concept of remote access or automatic call routing. The '479 patent and claim 24 do not involve a basic or fundamental business or economic practice or principle, algorithm, a conventional idea that existed in a pre-Internet world simply implemented by a computer, or an idea that could be performed by humans.

Rather, claim 24 describes a "particular approach"[22] to solving problems with prior art remote access patents that could only exist in a post-Internet world, utilizing a "location facility" that creates the private communication portal between the personal and remote computers in a specific way, even if the IP address of the personal computer is dynamic and not publicly addressable, to achieve the solution taught by the '479 patent. *See Contentguard,* 2015 WL 5853984, at *4 (patents not directed to abstract idea because disclose "particular solutions through the use of "trusted systems"). Accordingly, the Court concludes that the '479 patent and claim 24 are not directed to an

---

[22] Docket No. 349 (Deposition Dr. Gregory Ganger February 2, 2015 (["First Ganger Dep."]) at 12400 (58-59).).

"[T]he 479 patent describes and claims a particular approach to providing for remote access over the internet in an inexpensive and nontechnical way for the user, despite the difficulties created by dynamic and publicly unaddressable IP addresses and being linked to the internet indirectly via firewalls, network address translation,…N-A-T, devices and other internet gateways slash proxies. Unlike previous remote access systems and prior art, an internet service implementing the '479 patent technology handles all of these difficulties and other configurations while providing remote access for its users[.]"

abstract idea. But even if claim 24 were determined to be an abstract idea, the claim would still be patent eligible under the second step of the *Mayo* analysis.

### 3. Claim 24 contains an inventive concept

The second step of the *Mayo* test requires the Court to "search for an 'inventive concept' . . . that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294) (alteration in original). "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id.* at 2357 (quoting *Mayo*, 132 S. Ct. at 1297) (alterations in original).

While *Alice* made clear that "[t]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention[,]" *id.* at 2358, it is also clear that use of a computer does not automatically make a claim patent ineligible under § 101. The ultimate question of patent eligibility is whether the patent claims an "inventive concept" such that the elements of the claim transform the abstract idea into a patent eligible invention.

In *Diehr*, the Supreme Court found a computer implemented process using a "well-known" mathematical formula for curing rubber was patent eligible. That was so because considering the claim elements as a whole, the claim in *Diehr* contained "additional steps" that "transformed the process into an inventive application" and "improved an existing technological process[.]" *Alice*, 134 S. Ct. at 2358 (citations omitted).

A software patent can be eligible under § 101 when it claims a solution to a problem necessarily rooted in computer technology, and does not merely recite a conventional business or economic practice known from a pre-Internet world that is simply implemented on a generic computer performing generic computer functions. *DDR Holdings, LLC v. Hotels.com L.P.* 773 F.3d 1245, 1259 (Fed. Cir. 2014) ("[T]he claimed solution amounts to an inventive concept for resolving this particular Internet-centric problem, rendering the claims patent eligible.").

In *DDR Holdings*, the patents were directed to systems and methods of generating a composite web page that combined visual elements of a host website with the content of a third-party merchant. *Id.* at 1248. The patents addressed the problem of retaining visitors to a host website which, as explained in the specification, would be transported away from the host website if the website visitor clicked on an advertisement which activated a hyperlink to the advertiser's website. *Id.* The claimed invention for the composite web page provided the product information from the third-party merchant, but retained the "look and feel" of the host cite, thus retaining the host's website visitors by giving the viewer of the page the impression that she is viewing pages served by the host website. *Id.* at 1248-49.

Without concluding whether the claims were directed at an abstract idea, the Federal Circuit found that the claims were patent eligible because step two of the *Alice/Mayo* framework was satisfied. *Id.* at 1259. The court in *DDR Holdings* reached that conclusion because, unlike other patents involving both the computer and the Internet which merely recited "the performance of some business practice known from a

24

pre-Internet world along with the requirement to perform it on the Internet[,]" the claimed solution in *DDR Holdings* was "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id*. at 1257. Rather than merely reciting "use of the Internet" to perform an abstract business practice, the claims at issue in *DDR Holdings* specified how the Internet was manipulated to yield the desired result. *Id*. 1258. In addition, the claims did not "attempt to preempt every application of the idea of increasing sales by making two web pages look the same," but recited a specific way to create a composite web page through the use of an "outsource provider." *Id*. at 1259. These "additional features" ensure that the claims are "more than a drafting effort designed to monopolize the [abstract idea]." *Id*. (quoting *Alice*, 134 S. Ct. at 2357). Thus "the claimed solution amounts to an inventive concept for resolving the particular Internet-centric problem, rendering the claims patent eligible." *Id*.

For these same reasons, claim 24 is patent eligible under the second step of the *Alice/Mayo* analysis. Claim 24 claims a computer program product—software. Software runs on computers, but *Alice* did not foreclose all software based patents as ineligible under § 101 just because software runs on computers. The test is not the presence or absence of a computer, but the presence or absence of an inventive concept,

and courts post-*Alice* have found software patents and claims patent eligible on that basis.[23]

Citrix argues that claim 24 does not satisfy the second step of the *Alice/Mayo* analysis because claim 24 only requires generic software operating on a generic computer system to implement the abstract idea of connecting two computers, and lacks "additional features" necessary to find an inventive concept and ensure that the claim is not simply a drafting effort designed to monopolize an abstract idea. (Deft. § 101 Motion at 12131-32.) Citrix reaches this conclusion by separately examining individual elements of claim 24, which Citrix contends represent nothing more than generic computers performing generic functions.

In support of this position, Citrix cites the deposition testimony of Communique's expert, Ganger, and Communique's president and CEO, Andrew Cheung ("Cheung"). According to Citrix, their testimony establishes that there is nothing new in claim 24 and that the individual conventional elements of claim 24 existed in the computer world before the '479 patent. (Deft. § 101 Motion at 12131-41.)

---

[23] *DataTern, Inc. v. MicroStrategy, Inc.*, 7, Civil Action Nos. 11-11970-FDS, 11-12220-FDS, 2015 WL 5190715, at *8-9 (D. Mass. Sept. 4, 2015) (method for interfacing an object oriented software application with a relational database eligible under § 101 because it was directed to solving a problem that specifically arises in the realm of computing (object oriented programs exist only in the realm of computers) and does not address fundamental practices long prevalent in our system); *Maxus Strategic Sys., Inc. v. Aqumin LLC*, Cause No. A-11-CV-073-LY, 2015 WL 6756695, at *2 (E.D. Tex. Aug. 18, 2015) (patents generally relating to apparatus and method for displaying information in a virtual reality environment to facilitate the viewing of otherwise unmanageable amounts of data eligible under § 101); *Contentguard*, 2015 WL 5853984, at *6 (claims directed toward enforcing usage rights and restrictions on digital content eligible under § 101); *Stoneeagle*, 2015 WL 4042097, at *7-9 (claims directed to healthcare reimbursement system using virtual payment of benefit amount together with explanation of benefits provides a solution that is not an abstract idea); *California Inst. Tech.*, 59 F. Supp. at 994 (inventive concept because claims contain meaningful limitations such as the "irregular repetition of bits" and "linear transform operations" and, although limitations are mathematical algorithms, the algorithms are narrowly defined and "tied to a specific error correction process" that does "not preempt the field of error correction.").

But Citrix's argument regarding the individual elements fails to consider claim 24 as a whole, as required by *Alice*, and Citrix's citation to Ganger's testimony is selective. Ganger testified that specific individual elements of claim 24 were previously known, and that "under certain circumstances," remote access between two computers server computers was possible before the '479 patent. (First Ganger Dep. at 12395-97.) But the '479 patent does not claim to invent each individual element of the claim or remote access, but to solve the problems with existing remote access technology. ('479 patent, Col. 1:15-Col. 2:20.) Citrix ignores Ganger's testimony that the '479 patent discloses a "particular approach" with a number of specific features for solving problems in current remote access technology and that claim 24 that cannot be parsed into individual elements, but must be considered together as a whole. (Ganger Dep. at 12400-01 (61-64)); *Alice*, 134 S. Ct. at 2355 (elements of a claim must be considered both individually and "as an ordered combination").

Citrix likens claim 24 to claim 1 in *Pragmatus*, which the district court found merely contained generic computer functions without an inventive concept that transformed the abstract idea of an automated call distribution system into "something more." The district court in *Pragmatus* distinguished the claim before it from *DDR Holdings* because the claim simply automated contact between a customer and call centers, which "have existed for decades in the modern world." *Pragmatus*, 2015 WL 4128963, at *5. The plaintiff in *Pragmatus* did not demonstrate "how its claims are rooted specifically in a problem for computer technology, rather than the abstract concept of communication with call centers." *Id*. at *7 (citing *DDR Holdings*, 773 F.3d at 1257).

27

But unlike claim 1 in *Pragmatus*, which simply used a computer to automate a process that existed in a pre-Internet world, the '479 patent and claim 24 disclose a specific solution, rooted in computer technology, to remote access problems that can only arise in the realm of computer networks, and accomplishes that solution even in the face of specific Internet-centric challenges.

Claim 24 does not simply say: use the Internet to implement remote access between two computers. The preamble describes the use and purpose of the claimed computer product. The body of claim 24 specifies how the claimed computer program product accomplishes the solution of the '479 invention of creating a private communication portal between a remote computer and personal computer through the use of a "location facility" that acts as an intermediary between the remote and personal computers and creates the communication sessions by: (a) by "determining a current address or communication session for communicating with the personal computer"; (b) "making or bringing into existence a communication channel between the remote computer and the personal computer"; and (c) the "location facility" creates the communication channel whether the personal computer is linked to the Internet directly with a dynamic IP address, or indirectly with a publicly unaddressable dynamic LAN IP address.[24]

---

[24] Ganger testified that remote access was possible under certain circumstances before the '479 patent, but he could think of no examples of remote access to computers with publicly unaddressable dynamic IP addresses. (First Ganger Dep. at 12399 (56)). The '479 patent and claim 24 disclose a solution to that problem that constitutes an inventive concept. *See SimpleAir, Inc. v. Google Inc*., Case No. 2:14-cv-00011-JRG, —F. Supp. 3d—, 2015 WL 5675281, at *5 (E. D. Texas Sept. 25, 2015) ("At the very least, the [patents] disclose particular solutions for the problem of the lack of notification of information delivery when offline." (internal quotation marks and alternations omitted)).

Examined as a whole, the specific features, steps, and limitations of claim 24 provide a specific solution to remote access problems that is necessarily rooted in computer technology, and thus constitute an inventive concept—something more than an abstract idea merely implemented on a generic computer. *DDR Holdings*, 773 F.3d at 1257; *see also Versata Dev. Grp. Inc. v. SAP Am. Inc*., 793 F.3d 1306, 1334 (Fed. Cir. 2015) (distinguishing claims involving business methods implemented on a general purpose computer from claims in *DDR Holdings* "rooted in computer technology to solve a problem specifically arising in some aspect of computer technology"); *SimpleAir, Inc. v. Google Inc*., 2015 WL 5675281, at *5 (systems and methods for transmitting data to remote computing devices patent eligible because claim limitations sufficient to ensure claim amounts to more than patent on an abstract idea).

Moreover, the specific features, steps, and limitations of claim 24 with respect to the '479 patent's particular solution to computer remote access problems do not foreclose or preempt other solutions to problems concerning remote access technology. *DDR Holdings*, 773 F.3d at 1259; *see also Contentguard*, 2015 WL 5853984, at *6 (particular solution to problems concerning enforcement of usage rights does not foreclose other solutions).

Patent eligibility under § 101 is a question of law for the Court. The Court concludes, based on its analysis of claim 24 and the requirements of *Alice* regarding patent eligibility under § 101, that claim 24 is patent eligible under § 101 as a matter of

law.[25] Having concluded that claim 24 is patent eligible under § 101, dependent claim 45 is also patent eligible.

Accordingly, Citrix's motion for summary judgment that claims 24 and 45 are patent ineligible under § 101 is denied, and Communique's motion for summary judgment that claims 24 and 45 are patent eligible under § 101 is granted.

**D. Preclusive Effect of '479 Patent Reexamination on Citrix's Prior Art Arguments Regarding Invalidity**

Communique moves for judgment that Citrix may not assert prior art that was raised during the reexamination process.[26] Communique makes two arguments in support of its motion. First, Communique contends that 35 U.S.C. § 315(c), and uncodified Pub. L. No. 106-113, § 4607,[27] 113 Stat. 1501 (1999), preclude Citrix from asserting the invalidity of the '479 patent based on prior art argued by Citrix before the USPTO during reexamination. Second, Communique contends that common law issue preclusion also precludes Citrix from raising arguments that were raised during reexamination.

---

[25] The Court notes that the analysis for patent eligibility under § 101 is separate from issues of validity under §§ 102 or 103.

[26] The Court notes that Communique's motion for summary judgment to preclude evidence is perhaps more appropriately raised as a motion in limine. That said, the issue has been fully briefed by the parties and the Court will consider it in the context of summary judgment.

[27] SEC. 4607. Estoppel Effect of Reexamination.

> Any party who requests an inter partes reexamination under section 311 of title 35, United States Code, is estopped from challenging at a later time, in any civil action, any fact determined during the process of such reexamination, except with respect to a fact determination later proved to be erroneous based on information unavailable at the time of the inter partes reexamination decision. If this section is held to be unenforceable, the enforceability of the remainder of this subtitle or of this title shall not be denied as a result.

### 1. § 315(c) and § 4607

On December 7, 2007, Citrix Systems, Inc.[28] filed a request for an inter partes reexamination of the '479 patent on the grounds that the patent was invalid based on prior art before this case was assigned to this Court. The USTO granted the request for reexamination, which included claims 24 and 45 now at issue (Doc. No. 282-3.) But the '479 patent was not invalidated, and Citrix's reexamination petition was dismissed by the USPTO. (Doc. No. 230-2.).[29]

35 U.S.C. § 315(c) ("§ 315(c)") provides that:

> **(c) Civil action.**--A third-party requester whose request for an inter partes reexamination results in an order under section 313[30] is estopped from asserting at a later time, in any civil action arising in whole or in part under section 1338 of title 28, the invalidity of any claim finally determined to be valid and patentable on any ground which the third-party requester raised or could have raised during the inter partes reexamination proceedings. This subsection does not prevent the assertion of invalidity

---

[28] Defendant Citrix Online, LLC was not a defendant in the original complaint that was pending at the time the request for reexamination was filed, but was added to this case after the reexamination process was complete. Plaintiff contends that Citrix Online "is a privy" to Citrix Systems, and therefore, the estoppel effect of the reexamination process applies equally to both defendants, which the Citrix defendants have not disputed.  (Pltf. Infr. Motion at 11532; Deft. Infr. Motion.).

[29] Citrix appealed the dismissal to the Patent Trial and Appeal Board ("PTAB"), but the dismissal of the reexamination petition was affirmed. (Doc. No. 236-2.)  Citrix further appealed the decision of the PTAB to the United States Court of Appeals for the Federal Circuit, but the Federal Circuit affirmed the PTAB. (Fed. Cir. Case No. 14-1240, Doc. No. 40-2, Oct. 16, 2014.)

[30] The "order under section 313" referred to in § 315(c) is the order issued pursuant to 35 U.S.C. § 313 granting request for inter partes reexamination.

31

based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings.

35 U.S.C. § 315(c) (Effective November 2, 2002-September 15, 2012) (footnote added).[31]

At the time that Citrix requested reexamination, the statute limited inter partes reexamination requests to arguments based on prior art patents or printed publications.[32] *See* 35 U.S.C. § 315(c); 37 C.F.R. § 1.915 (Effective May 16, 2007-September 22, 2011.) With this Communique does not disagree: "During reexamination, public documents can be argued to invalidate a claim, but source code, for example, that was not publicly disclosed and deposition testimony cannot be discussed." (Pltf. Infr. Motion at 11535.) "[T]he resulting estoppel [of § 315(c)] is similarly limited." *Mikkelsen Graphic Eng'g, Inc. v. Zund America, Inc.*, 541 F. App'x 964, 974 (2013). The only "grounds" that Citrix could raise with respect to validity of the '479 patent is limited to the content of prior art patents and printed publications that were submitted or could have been submitted during reexamination.

Citrix intends to present invalidity evidence at trial with respect to the following prior art systems: (1) BuddyHelp, (2) ExpertLive, (3) pcAnywhere 9.0, (4) Microsoft NetMeeting 2.1 and Microsoft Internet Locator Server, (5) PhonePatch, (6) NetOp Remote Control 6.0, and (7) Activision Active Net Software. (Deft. Infr. Motion

---

[31] The Patent Statute was amended in September 2011 by the America Invents Act to replace the inter partes reexamination proceeding with the new inter partes review proceeding. Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284, 300-01 (2011). Citrix's reexamination request was filed on December 12, 2007, so the pre-amendment provision applies to this analysis. *See id.* at 304. The parties agree that the pre-amendment version of § 315(c) applies to this case. (Deft. Infr. Motion at 13150 n. 12.).

[32] A "printed publication" is a publication that pre-dates the challenged patent. *See* 35 U.S.C. § 102.

at 13149.) The invalidity evidence that Citrix seeks to introduce during trial with respect to this prior art includes confidential source code, witness testimony, expert testimony, and evidence of product availability and use, which Citrix argues was not and could not have been introduced during reexamination, and therefore are not subject to estoppel. At a minimum, Citrix contends that there are disputes of material fact as to whether the invalidity evidence Citrix now seeks to assert was considered in reexamination, and those disputes alone necessitate the denial of Communique's summary judgment motion. (Deft. Infr. Motion at 13149.).

### a. BuddyHelp/Expert Live

Communique contends that Citrix devoted 51 pages of its request for reexamination to BuddyHelp references, and that with respect to its current invalidity contentions, Citrix offers no new information regarding the functionality of BuddyHelp that was not considered by the USPTO. (Pltf. Infr. Motion at 11536.) That said, Communique appears to concede that the source code for BuddyHelp was not part of the USPTO's reexamination, but blames Citrix for improperly withholding the source code, claiming that it "contains a number of 'open source' materials" which Citrix should have disclosed. (Pltf. Infr. Motion at 11537-38.) In response, Citrix contends that the BuddySource source code is highly confidential, and not a printed publication that must be disclosed to the USPTO. (Deft. Infr. Motion at 13152 (citing Doc. No. 346-4 (Expert Report of Ian Foster ("Foster") Nov. 25, 2015 (["First Foster Report"])) ¶¶ 134-42.).

On summary judgment, the moving party must advance evidence which demonstrates the absence of a genuine dispute of material fact, after which the opposing party must come forward with specific evidence showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323. As an initial matter, Communique admits that source code that is not publicly available cannot be discussed during reexamination. Moreover, Communique does not contend that all of the source code for BuddyHelp was arguably publicly available as an open-source, but only that the BuddyHelpsource code contains "a number of third-party open source materials." (Pltf. Infr. Motion at 11537.) Communique's qualified argument regarding the public availability of the BuddyHelp source code is on its face insufficient to demonstrate that there is no genuine dispute that BuddyHelp source code was publicly available. In addition to the BuddyHelp source code, Citrix also intends to introduce at trial fact and expert testimony, expert reports, and deposition testimony, which Communique recognizes could not be introduced during reexamination. (Pltf. Infr. Motion at 11535 ("During reexamination, public documents can be argued to invalidate a claim, but source code, for example, that was not publicly disclosed and deposition testimony cannot be discussed.").)

Accordingly, the Court concludes that Communique has failed to establish that it is entitled to a ruling in its favor on summary judgment that the Court should preclude Citrix from presenting all invalidity evidence regarding the BuddyHelp.

With respect to ExpertLive, Communique contends that ExpertLive should also be excluded because Citrix admits that "relevant portions" of the BuddyHelp and ExpertLive programs are the same code, and therefore ExpertLive's "functionality" is the same as BuddyHelp, and should be excluded on the same basis as BuddyHelp. (Pltf. Infr. Motion at 11536 (citing Doc. No. 377 (Deposition of Ian Foster Jan. 9, 2015 ["First Foster Dep."]) at 13832-36 (64-68)). But Citrix points to Foster's deposition testimony that states the two source codes are not identical. (Deft. Infr. Motion at 13155 (citing First Foster Dep. at 13836 (68).).

At a minimum, there is a fact dispute regarding the identity of source code between BuddyHelp and ExpertLive.  Moreover, even if it is true that certain portions of the code for ExpertLive and BuddyHelp are the same, there is no dispute that the BuddyHelp source code was not part of the reexamination process, and the deficiencies of Communique's argument regarding preclusion of BuddyHelp source code apply equally to ExpertLive. Additionally, as with BuddyHelp, expert testimony, witness testimony, and other evidence beyond prior art and printed publications regarding ExpertLive could not have been introduced during reexamination.

Therefore, the Court concludes that Citrix is not precluded by § 315(c) or § 4607 from introducing invalidity evidence at trial regarding BuddyHelp and ExpertLive that was not a patent or printed publication that was introduced, or could have been introduced, during the reexamination. Accordingly, Communique's sweeping motion for exclusion of all invalidity evidence related to BuddyHelp and ExpertLive is denied.

b. *pcAnywhere*

With respect to this prior art evidence, Communique contends that all of the pcAnywhere publications currently relied upon by Citrix with respect to invalidity were available during the reexamination "and, in fact, were submitted to the Patent Office during [reexamination.]" (Pltf. Infr. Motion at 11538 (citing Doc. No. 346-10 ["Information Disclosure Statement"] at 3 (page ID # 12042).). The document to which Communique cites refers to a single news release regarding pcAnywhere linked at the website www.symantec.com. Based on this, Communique argues that Citrix has identified no new material evidence related to pcAnywhere's "functionality," and should be estopped from further litigating this prior art. Citrix contends that pcAnywhere was not considered during reexamination, and points to its reexamination request which does not include pcAnywhere in the list of patents and printed publications identified by Citrix to be considered during reexamination. (Deft. Infr. Motion at 13157 (citing Reexam Req. at 6-7 (7868-7869)).).

At a minimum, the parties have a fact dispute regarding what documentation, if any, was submitted during reexamination regarding pcAnywhere. That said, even if pcAnywhere was considered during reexamination, that consideration would be limited to prior art patents and printed publications. The invalidity evidence that Citrix seeks to introduce at trial could not have been considered during reexamination: a physical boxed product, a witness declaration, expert reports and testimony, and purchase orders. (Deft. Infr. Motion at 13157.) *See ACCO Brands, Inc. v. PC Guardian Anti-Theft Prods., Inc*., 592 F. Supp. 2d 1208, 1217-18 (N. D. Calif. 2008) (§ 315(c) does not

prevent use of physical computer as evidence of invalidity because reexamination is limited to consideration of patents and printed publications, and there is no evidence of dimensions of security slot other than the computer itself). Since the evidence Citrix seeks to introduce at trial regarding pcAnywhere could not have been submitted during reexamination, it is not barred by § 315(c). Accordingly, Communique's motion to exclude all invalidity evidence regarding pcAnywhere is denied.

> *c. Microsoft NetMeeting 2.1, Microsoft Internet Locator Server, PhonePatch, NetOp 6.0, and Activision Active Net*

Communique's arguments regarding the exclusion of the above-captioned prior art is the same as before—this prior art was considered during the reexamination, and therefore cannot be a basis for Citrix's invalidity arguments at trial. (Pltf. Infr. Motion at 11539-41.) With respect to this prior art, Citrix once again argues that it does not seek to assert patents and printed publications, but evidence that could not have been asserted during reexamination: fact witness declarations and testimony, expert reports and testimony, sales records, and confidential source code. For the same reasons discussed above, Citrix is not estopped from introducing all invalidity evidence of the above-listed prior art.

**2. Issue preclusion**

Communique's final argument is that Citrix is excluded from introducing prior art evidence that was subject to reexamination because the reexamination process resulted in a conclusion that the patents were valid in light of that prior art and Citrix cannot now relitigate those issues.

37

> Collateral estoppel protects a party from having to litigate issues that have been fully and fairly tried in a previous action and adversely resolved against a party-opponent. *Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.,* 170 F.3d 1373, 1379 (Fed. Cir. 1999). Our review of a collateral estoppel determination is generally guided by regional circuit precedent, but we apply our own precedent to those aspects of such a determination that involve substantive issues of patent law. *Aspex Eyewear, Inc. v. Zenni Optical Inc.,* 713 F.3d 1377, 1380 (Fed. Cir. 2013); *see also Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.,* 672 F.3d 1335, 1341 n. 1 (Fed. Cir. 2012) ("[T]he question whether a particular claim in a patent case is the same as or separate from another claim has special application to patent cases, and we therefore apply our own law to that issue.").

*Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013); *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC,* 778 F.3d 1311, 1314 (Fed. Cir. 2015) (regional circuit law applies to the general procedural question of whether issue preclusion applies).

Under Sixth Circuit precedent, there are four essential elements to a claim for issue preclusion: "(1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding." *Schreiber v. Philips Display Components Co.,* 580 F.3d 355, 367 (6th Cir. 2009) (citations omitted).

The Court concludes that, at least the first and second elements of issue preclusion are not satisfied because the standard of proof, and purpose of the reexamination proceedings, pursuant to 35 U.S.C. § 305 and a district court infringement proceeding in which patent invalidity is asserted as a defense, are entirely different. *In re*

*Swanson*, 540 F.3d 1368, 1377-78 (Fed. Cir. 2008) ("PTO examination procedures have distinctly different standards . . . purposes, and outcomes compared to civil litigation" (citing *In re Etter,* 756 F.2d 852, 856 (Fed.Cir.1985). Therefore, the same precise issues and arguments are not raised in a reexamination proceeding as may be raised in a district court proceeding.

> In civil litigation, a challenger who attacks the validity of patent claims must overcome the presumption of validity with clear and convincing evidence that the patent is invalid. 35 U.S.C. § 282. If this statutory burden is not met, "[c]ourts do not find patents 'valid,' only that the patent challenger did not carry the 'burden of establishing invalidity in the *particular case* before the court.'" *Ethicon,* 849 F.2d [1422, 1429] at n. 3 [Fed. Cir. 1988] (internal citations omitted) (emphasis in original).
>
>           * * * *
>
> In PTO examinations and reexaminations, the standard of proof—a preponderance of evidence—is substantially lower than in a civil case, *In re Caveney,* 761 F.2d 671, 674 (Fed.Cir.1985); there is no presumption of validity, *Etter,* 756 F.2d at 856; and the "examiner is not attacking the validity of the patent but is conducting a subjective examination of the claims in light of prior art," *id.* at 857–58. And unlike in district courts, in reexamination proceedings "[c]laims are given 'their broadest reasonable interpretation, consistent with the specification....' " *Trans Tex. Holdings,* 498 F.3d at 1298 (quoting *In re Yamamoto,* 740 F.2d 1569, 1571 (Fed.Cir.1984)).

*Id*.

         In addition to the reasons stated above for denying Communique's motion for sweeping preclusion of all prior art references raised in the reexamination from this civil action, the difference in purpose, procedures, evidence, and standards of proof between the two forums on the issue of invalidity do not support a finding that the first and second element of issue preclusion are satisfied.

Accordingly, Communique's motion to excluded all evidence of prior art is denied. Communique is not precluded, however, from objecting at trial to the introduction of prior art evidence that was, or could have been, introduced during reexamination.

**E. Direct Infringement**

Direct infringement occurs when one, "without authority makes, uses, offers to sell, or sells any patented invention" within the United States. 35 U.S.C. § 271(a). Claim 24 claims a "computer program product." "Direct infringement requires a party to perform each and every step or element of a claimed method or product." *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378-79 (Fed. Cir. 2007) (overruled on other grounds by *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012)) (citing *Warner-Jenkinson Co., Inc. v. Hilton Davis Corp.*, 520 U.S. 17, 117 S. Ct. 1040 137 L. Ed. 2d 146 (1997) (holding that doctrine of equivalents, like literal infringement, must be tested element by element) (other citations omitted). "Infringement, whether literal or under the doctrine of equivalents, is a question of fact." *Cook Biotech Inc. v. Acell, Inc.,* 460 F.3d 1365, 1373 (Fed. Cir. 2006). "In the summary judgment setting, the proper inquiry is whether or not, drawing all justifiable inferences in favor of the non-moving party, the evidence is such that a reasonable jury could return a verdict for the non-movant." *Ortho–McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.,* 476 F.3d 1321, 1326 (Fed. Cir. 2007) (citing *Cook Biotech Inc.,* 460 F.3d at 1373).

Communique moves for summary judgment that Citrix's GoToMyPC literally infringes independent claim 24 and dependent claim 45 of the '479 patent. (Pltf.

Infr. Motion at 11521.) Literal infringement of a claim exists when "each of the claim limitations 'reads on'" or is found in the accused product. *Allen Eng'g Corp. v. Bartell Ind., Inc.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002) (citations omitted). "Equivalence may be established by a showing by preponderant evidence that an element of an accused device does substantially the same thing in substantially the same way to get substantially the same result as the claim limitation." *Id.* (internal quotation marks and citations omitted).

Citrix has opposed Communique's motion for judgment of direct infringement, but has not filed a cross motion. Therefore, all justifiable inferences must be drawn in favor of Citrix.

According to Citrix's expert, "GoToMyPC is an Internet-based service that enables secure remote access to a host computer from a client computer." (Doc. No. 346-5 (Expert Report of Ian Foster Dec. 23, 2014 (["Second Foster Report"]) ¶ 45.) The "host" computer is the personal computer that is being accessed by a "viewer" (the remote computer). (Second Foster Report ¶¶ 49-50.) GoToMyPC utilizes a number of servers, which include Poll Servers, a Broker, database servers, a commerce server, Communication servers, and load balancers. (Second Foster Report ¶ 51.).

Communique contends that GoToMyPC literally infringes the following limitations of claim 24: computer program product; server computer having a static IP address and providing access to a personal computer from a remote computer; location facility and server computer; intermediary between; determining the then current location of the personal computer; and creating a communication channel and creating one or more communication sessions between a personal computer and a remote computer.

41

In opposition, Citrix contends that there are genuine disputes of material fact with respect to the issue of direct infringement and summary judgment is not appropriate. Without waiving its non-infringement arguments with respect to other limitations of claim 24 that Communique alleges are infringed by GoToMyPC, Citrix focuses its opposition to Communique's direct infringement motion on two specific limitations: (1) "creating a communication channel"; and (2) "determining the then current location of the personal computer." (Deft. Infr. Motion at 13133.) Therefore the Court will begin its analysis here.

The Court has construed "determining the then current location of the personal computer" to mean "determining a current address or communication session for communicating with the personal computer." (CC Op. at 11484.) The focus of Communique's infringement argument is that GoToMyPC infringes this limitation because GoToMyPC servers determine the current communication session of the personal computer for communicating with remote computer. Communique does not contend that the GoToMyPC servers determine the current IP address of the host (personal) computer.

In order to use GoToMyPC, the user must install software on the host (personal) computer, which includes a Host Launcher that "registers" the host computer. (Second Foster Report ¶ 68.) The Host Launcher maintains a "persistent" connection to

the Poll Server, and the Poll Server sends "notifications and other data" to the host computer. (Second Foster Report ¶¶ 69-70.[33]).

The connection between the host and Poll Server is not the same for all versions of GoToMyPC. Before version 5, "instead of looking up an existing persistent connection with the Host, the Poll Server waits until the Host establishes a new connection to the Poll Server and then responds to that new connection by informing the Host of the pending Viewer request for remote access." (Pltf. Infr. Motion at 11525 n. 7 (citing Ganger Report ¶ 55).) In versions 5 and later, the host software opens a persistent connection and sends a "keep alive" message every 60 seconds to "make sure it stays active." (Ganger Report ¶ 55.). The full text of paragraph 55 of Ganger's report follows:

> 55. To create the communication session, the GoToMyPC server must determine a current location of the personal computer. In GoToMyPC versions before 5.0, the current location of the personal computer is determined by waiting until the next time it sends its periodic HTTP request to a GoToMyPC server computer running the Poll Server

---

[33]

69. Once the Host Launcher is installed on the Host computer and the Host is registered, the Host Launcher creates a persistent HTTP connection to a Poll Server (via the load balancer in front of the Poll Servers). In earlier versions of GoToMyPC (*i.e.*, versions before 5.0), the Host would create an HTTP connection to a Poll Server every 30 seconds, and then the connection was ended. However, in more recent versions of GoToMyPC, the Host leaves open the connection for as long as possible and sends keep-alive messages every 30 seconds. If the connection is dropped, the Host will create a new connection to a Poll Server. Thus, for example, if the Host computer is turned off, it will create a new connection when it is restarted and is online again.

70. The persistent connection allows the Poll Server to send notifications and other data to the Host computer. The Host Launcher waits for a notification of a new event from the Poll Server. When the Host Launcher receives a notification of a new event, it creates a new connection to a Poll Server (which may or may not be the same Poll Server with which it has a persistent connection) and requests further information about the event. In response to this request from the Host Launcher, the Poll Server replies to the Host with additional information. This message may include information about one of a number of things, such as information about a software update or about a pending request from a Viewer computer for remote access.

(Second Foster Report ¶¶ 69-70.).

software; in these versions, the GoToMyPC host software is designed to send an HTTP request every fifteen seconds. In GoToMyPC 5.0 and later versions, the current location of the personal computer is the current persistent connection between the personal computer and a GoToMyPC server computer running the Poll Server software, and it is determined by searching the list of current persistent connections for the one for the specific personal computer; in these versions, the GoToMyPC host software opens a persistent connection, sends a "keep alive" message every sixty seconds to make sure it is stays active, and opens a new one when necessary. In both cases, the current location determined is a current communication session between the personal computer and a GoToMyPC server computer. [] If the IP address of the personal computer changes during a communication session between the personal computer and the remote computer, GoToMyPC creates a new communication session between the personal computer and the remote computer using the then current IP address of the personal computer.

(Ganger Report ¶ 55 (footnote omitted).).

Source codes on GoToMyPC's Poll Server provides a number of functions, including "looking up the persistent connection with a Host, and sending notifications to the Host that the Poll server has information for it." (Second Foster Report ¶ 195.) The full text of paragraph 195 of the Second Foster Report follows:

195. Next, Dr. Ganger cites the Poll Server source code files "PollSrv\main\Sources\RequestHandler.cpp" and "PollSrv\main\Sources\RefreshResponseProcessor.cpp." The file RequestHandler.cpp includes source code to help establish a persistent connection between the Host and the Poll Server, and the file RefreshResponseProcessor.cpp includes source code for processing notifications from the Broker, looking up the persistent connection with a Host, and sending a notifications [sic] to the Host that the Poll Server has information for it. This code does **not** correspond to the creation of any communication channel between the endpoints.

(Second Foster Report ¶ 195 (emphasis in original).).

44

Using the language of Citrix's expert, Communique argues that when the Poll Server "looks up" the persistent connection with the host, it is determining the current communication session of the personal computer as required by claim 24 and, therefore, it is entitled to judgment as a matter of law that GoToMyPC literally infringes the "determining the then current location of the personal computer" limitation of claim 24 as construed by the Court. (Pltf. Infr. Motion at 11525.). In Ganger's view, the GoToMyPC server determines the current location of the personal computer "by waiting until the next time it sends its periodic HTTP request to a GoToMyPC server computer running the Poll Server software." (Ganger Report ¶ 55.).

In opposing Communique's motion, Citrix points out that Communique admits that the persistent connection between the Poll Server is established and maintained by the host—not the Poll Server—and the Poll Server simply responds to the host's connection with information regarding a request from the viewer (remote computer) regarding a request for remote access. (Deft. Infr. Motion at 13147 (quoting Pltf. Infr. Motion at 11525 n.7).) Citrix further argues that the language of claim 24 requires that the location facility—"in response to receipt of the request for communication with the personal computer from the remote computer"—"determin[es] a then current location of the personal computer[.]"

In Foster's view, determination of the location of the personal computer in claim 24 requires action on the part of the location facility, whereas in GoToMyPC, the Poll Server simply awaits contact from the host and then provides the host with whatever messages the Poll Server has for it, including a pending request from a remote computer

45

for communication. (Second Foster Report ¶ 163.) Moreover, the host (personal computer) initiates and maintains its connection with the Poll Server on a regular periodic basis whether or not there is any request for communication by a viewer (remote computer), whereas claim 24 requires that the location facility determine the then current location of the personal computer in response to a request for communication from the remote computer. (*Id.*).

> 163. I also disagree that "waiting until the next time [the personal computer] sends its periodic HTTP request" (what Dr. Ganger refers to for versions before 5.0) meets this limitation. Claim 24 requires that the "determining" step be performed "in response to receipt of the request for communication with the personal computer from the remote computer." However, in versions of GoToMyPC before 5.0, the personal computer periodically contacts the Poll Server regardless of whether a Viewer computer has requested access. Therefore, the periodic HTTP request is not sent "in response to" a request for communication. In addition, the word "determining" connotes action on the part of the server computer. Therefore, simply "waiting" for something to happen, as Dr. Ganger suggests, cannot meet this limitation.

(Second Foster Report ¶ 163.).

The parties' experts disagree as to whether the persistent connection initiated and maintained by the host (personal computer) with the Poll Server, regardless of whether or not there is a request for communication, satisfies the limitation in claim 24 where the then current location of the personal computer is determined by the location facility in response to a request for communication. (Second Foster Report ¶ 163; Ganger Report ¶ 55).

The competing facts and evidence advanced by each side on the issue of direct infringement centers on the disagreement between their experts as to whether GoToMyPC satisfies the "determining the then current location of the personal

46

computer" limitation of claim 24. Competing expert opinions in this case preclude summary judgment. *Saint Gobain Autover USA, Inc. v. Xinyi Glass North America, Inc.* 666 F. Supp. 2d 820, 833 (N.D. Ohio 2009) (citations omitted).

Construing all reasonable inferences in favor of Citrix as the non-moving party, as the Court must, the Court concludes that summary judgment on the issue of direct infringement of claim 24 with respect to this limitation is not appropriate because a reasonable factfinder could find in favor of either party. It is the role of the factfinder at trial, not the Court on summary judgment, to consider the qualifications of the experts and the strength of their opinions.

In order for GoToMyPC to infringe claim 24 of the '479 patent, it must infringe each limitation of the claim. *Allen Eng'g Corp.*, 299 F.3d at 1345. Having concluded that there is a genuine dispute of material fact with respect to the limitation of claim 24—"determining the then current location of the personal computer"—the Court need not address the parties' arguments with respect to direct infringement of the other limitations of claim 24. A fact dispute regarding a single limitation of claim 24 precludes summary judgment of direct infringement for the entire claim.

Accordingly, Communique's motion for summary judgment of direct infringement of claims 24 and 45 is denied.

## F. Willful Infringement

35 U.S.C. § 284 provides that "[u]pon a finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement . . .." That section also gives the Court discretion to enhance damages. *Id.* ("[T]he court may

increase damages up to three times the amount [of damages] found or assessed.").

The standard for enhancing damages for willful infringement is, at this time, controlled by the Federal Circuit's opinion in *In Re Seagate Tech., LLC,* 497 F.3d 1360, 1371 (Fed. Cir. 2007). Under the *Seagate* standard, "proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness." *Id*. ("[A] patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. . . . The state of mind of the accused infringer is not relevant to this objection inquiry.") (internal citations omitted). This is the "objective" prong of the *Seagate* standard. If the objective prong is met, the patentee "must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Id*. This is the "subjective" prong of the *Seagate* standard.

The objective prong is a question of law for the Court, and the subjective prong is reserved for the jury. *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.,* 682 F.3d 1003, 1006 (Fed. Cir. 2012). "Should the court determine that the infringer's reliance on a defense was not objectively reckless, it cannot send the question of willfulness to the jury, since proving the objective prong is a predicate to consideration of the subjective prong. When the resolution of a particular issue or defense is a factual matter, however, whether reliance on that issue or defense was reasonable under the objective prong is properly considered by the jury." *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236-37 (Fed. Cir. 2011) (internal citation omitted) (citing *DePuy Spine*

*Inc., v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1335-37 (Fed. Cir. 2009) and *Uniloc USA, Inc., v. Microsoft Corp.*, 632 F.3d 1292, 1311 (Fed. Cir. 2011)).

   Citrix moves for summary judgment on Communique's claim for willful infringement because, even if Communique can establish infringement, Communique cannot show, as a matter of law, that Citrix was objectively reckless. (Deft. Infr. Motion at 13161.) In support of this argument, Citrix contends that the record demonstrates that there are substantial questions about invalidity or infringement, and therefore, Communique cannot meet the "objective recklessness" prong of the Seagate standard. (Deft. Infr. Motion at 13162 (citing *Seagate*, 497 F.3d at 1374).) Specifically, Citrix argues that its non-infringement defenses are reasonable because they are grounded in the language of the claims, the specification, and the prosecution and reexamination[34] histories.

   Communique argues that Citrix's motion as to willful infringement should be rejected for two reasons. First, Communique contends that the Seagate standard is in doubt based on the decision of the United States Supreme Court in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,*—U.S.—, 134 S. Ct. 1749, 1757-58, 188 L. Ed. 2d (2014),[35] and that the Federal Circuit itself is split as to whether *Octane Fitness* has abrogated *Seagate*. (Pltf. Infr. Reply at 13554 (citing *Halo Elec., Inc. v. Pulse Elec., Inc.*,

---

[34] Actions by the USPTO with respect to reexamination are of "limited value" with respect establishing a good faith belief of invalidity. *SSL Services, LLC v. Citrix Systems*, 769 F.3d 1073, 1092-93 (2014) (collecting cases). *Acoustical Design, Inc. v. Control Elecs. Co*., 932 F.2d 939, 942 (Fed. Cir. 1991) ("[I]nitial rejection by the Patent and Trademark Office of original claims that later were confirmed on reexamination hardly justifies a good faith belief in the invalidity of the claims.").

[35] In *Octane Fitness*, the Supreme Court rejected the "willfulness" test with respect to attorney fees in a patent infringement case pursuant to 28 U.S.C. § 285.

780 F.3d 1357, 1359, 1362 (Fed. Cir. 2015) (citing Taranto, J. concurring and O'Malley, J. dissenting).) Indeed, the Supreme Court has granted certiorari in two cases to address the Federal Circuit's test for enhanced damages under § 284: *Halo Electronics v. Pulse Electronics,* Inc., S. Ct. No. 14-1513 (Oct. 19, 2015) and *Stryker Corp. v. Zimmer, Inc*., S. Ct. No. 14-1520 (Oct. 19, 2015). (Doc. No. 388 (Plaintiff's Notice of Additional Authority)).). Second, Communique contends that summary judgment with respect to willful infringement is premature because the strength of Citrix's asserted defenses raise issues of fact, and the issue of willfulness should not be undertaken until after a jury has considered and decided Citrix's defenses at trial. (Pltf. Infr. Reply at 13555 (citing *Bard,* 682 F.3d at 1008).).

The Court has concluded, supra, that Communique's motion for summary judgment of direct infringement must be denied because a factfinder could reasonably find in favor of either party. "Objective recklessness will not be found where the accused infringer's 'position is susceptible to a reasonable conclusion of no infringement.'" *Stryker Corp. v. Zimmer, Inc*. 782 F.3d 649, 660 (Fed. Cir. 2014) (quoting *Uniloc*, 632 F.3d at 1310). This is true even if the jury ultimately finds infringement. *See Stryker*, 782 F.3d at 662 (reversing district court's award of treble damages for willful infringement after jury verdict of infringement).

The Federal Circuit's standard for determining enhanced damages under § 284 is currently under review by the Supreme Court, and the Court does not expect that a decision will be issued before the trial in this case. If the Court grants Citrix's motion for summary judgment on willful infringement based on the *Seagate* standard and the

50

Supreme Court overrules this standard, another trial in this case on the issue of willful infringement may be required if Communique prevails. On the other hand, if Communique does not prevail at trial on its infringement claim, then the issue of willful infringement is moot.

Moreover, courts have broad discretion to set the order of trial. Even though the objective prong is a question of law for the Court, issues that affect resolution of the objective prong inquiry may properly be considered after the jury has considered the subjective prong in the infringement. *Powell*, 663 F.3d at 1237 n.2; *Cook, Inc. v. Endologix*, No. 1:09-cv-01248-TWP-DKL, 2012 WL 3779198, at *2 (S.D. Ind. Aug. 30, 2012) (declining to rule on willful infringement on summary judgment because an underlying question of law for the judge may be determined at the close of evidence and after the jury verdict) (citing *Bard*, 682 F.3d at 1008).

Given the uncertainty in the law, and in the interest of efficiency and judicial economy, the Court denies Citrix's motion for summary judgment without prejudice, with leave to reassert the issue at a later time.

## G. Inducement

Communique's third amended complaint alleges that Citrix induced others to infringe the '479 patent. Pursuant to 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." Unlike direct infringement, which is a strict-liability offense that is not dependent upon defendant's mental state, liability for inducing infringement "attaches only if the defendant knew of the patent and that 'the induced acts constitute patent infringement.'" *Commill USA, LLC v. Cisco Sys.*,

*Inc.*, —U.S.—, 135 S. Ct. 1920, 1926, 191 L. Ed. 2d 883 (2015) (quoting *Global–Tech*

*Appliances, Inc. v. SEB S.A.,* 563 U.S. 754, 131 S. Ct. 2060, 2068, 179 L. Ed. 2d 1167

(2011)). *Global Tech* requires "proof the defendant knew the acts were infringing."

*Commill,* 135 S. Ct at 1928 (citing *Global Tech*, 563 U.S. ____, 131 S. Ct. at 1026-28).

> A party who "actively induces infringement of a patent" under 35 U.S.C. §
> 271(b) is liable for patent infringement if the party knows that the induced
> acts constitute patent infringement. *Global–Tech Appliances, Inc. v. SEB
> S.A.,* 563 U.S. 754, 131 S. Ct. 2060, 2063, 179 L. Ed. 2d 1167 (2011). A
> defendant can be found liable for induced infringement if it has actual
> knowledge of the infringement, or if it is willfully blind to the
> infringement. *Id.* The doctrine of willful blindness requires that "(1) the
> defendant must subjectively believe that there is a high probability that a
> fact exists and (2) the defendant must take deliberate actions to avoid
> learning of that fact." *Id.* at 2070.
>
> "The requisite intent to induce infringement may be inferred from all of
> the circumstances," and may be established through circumstantial
> evidence." *Broadcom Corp. v. Qualcomm, Inc.,* 543 F.3d 683, 699 (Fed.
> Cir. 2008).

*Suprema, Inc. v. Int'l Trade Comm'n*, No. 2012-1170, 2015 WL 5315371, at *5 (Fed. Cir.

Sept. 14, 2015).

        Citrix moves for summary judgment on Communique's claim for induced

infringement on the grounds that Communique cannot prove as a matter of law that Citrix

undertook affirmative acts to encourage infringement with the knowledge that the

induced acts constituted patent infringement. (Deft. Infr. Motion at 13165.) ("[P]laintiff

has adduced no evidence of direct infringement by a third party and cannot establish that

Citrix meets the knowledge requirement."). According to Citrix, Communique cannot

establish that Citrix possessed the requisite knowledge because Citrix "has always

believed, and continues to believe, that it does not infringe the '479 patent." (Deft. Infr.

Motion at 13165-66.) In support, Citrix cites its non-infringement arguments, expert reports, and interrogatory responses. (Deft. Infr. Motion at 13166 (citing the Second Foster Report; Doc. No. 367 (Rule 26 Report of Dr. Azer Bestavros); Doc. No. 368 (Excerpts from Response to Interrogatory No. 5).) From this evidence, Citrix argues, no reasonable juror could conclude that Citrix acted with "actual knowledge" that it was inducing infringement or with "willful blindness." (Deft. Infr. Motion at 13166.).

On summary judgment, when the moving party advances evidence in support of its motion, the non-moving party must come forward with evidence demonstrating that there is a genuine dispute of material fact. In response to Citrix's motion, Communique simply states that Citrix "has failed to identify any facts showing a good faith belief of non-infringement," and that sufficient evidence exists from which a jury could conclude that Citrix intended to induce infringement of the '479 patent by users of GoToMyPC, including Citrix's own advertising materials and user manuals, which Communique contends encourages the infringing use. (Pltf. Infr. Reply at 13559 (citing Doc. No. 376-3 (Excerpts from Ganger Deposition) at 13571-74 (testifying that users of GoToMyPC are encouraged to infringe by Citrix)) and Doc. No. 376-17 (GoToMyPC User Guide)).

First, it is not Citrix's burden to show a good faith belief of non-infringement—it is Communique's burden to show under § 271(b) "that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements". *Lucent Techs., Inc. v. Gateway, Inc.* 580 F.3d 1301, 1321-22 (Fed. Cir. 2009) (citing *Manville Sales Corp. v. Paramount Sys., Inc.*,

917 F.2d 544, 553 (Fed. Cir. 1990) (further citations omitted)).  Second, on summary judgment, once Citrix advances evidence in support of its motion that Communique cannot establish an essential element of its claim, it is Communique's burden under Rule 56 to come forward with evidence that demonstrates that there is a genuine issue of material fact with respect to its claim that Citrix actively induced GoToMyPC users to infringe the '479 patent. But Communique has not come forward with any evidence that Citrix had requisite intent to induce infringement, either through direct or circumstantial evidence.

Moreover, the Court has determined herein that the issue of direct infringement must be submitted to a jury because a factfinder could reasonably find in favor of either party with respect to whether GoToMyPc directly infringes claim 24 of the '479 patent. The evidence advanced by Citrix in support of its argument that Communique cannot establish the requisite intent necessary to prove induced infringement is consistent with the Court's conclusion that the issue of direct infringement must be submitted to a jury. Communique has failed to come forward on summary judgment with evidence from which a reasonable juror could conclude (assuming that the jury finds direct infringement) that Citrix acted with actual knowledge it was inducing infringement or was willfully blind to it. *See Unwired Planet, LLC v. Apple Inc*, No. 13-CV-04134-VC, 2015 WL 3396409, at *10 (N.D. Cal. May 26, 2015) (even though the question of literal infringement should go to a jury, the question of induced infringement should not).

Accordingly, Citrix's motion for summary judgment on Communique's claim of inducing infringement is granted.

**H. Permanent Injunction**

The parties agree that, in order to be entitled to a permanent injunction, a plaintiff must show that: (1) it has suffered an irreparable injury; (2) remedies available at law are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)).

Citrix moves for summary judgment that Communique is not entitled to injunctive relief because Communique cannot establish irreparable harm and that monetary damages are adequate to compensate Communique for any damages should Citrix be found to be liable for infringement. (Deft. Infr. Motion at 13166-70.). There is no dispute, however, that the parties in this case are competitors in the remote access business. "Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013).

It is premature to address the availability of injunctive relief until fact evidence is introduced at trial and a determination is made regarding Communique's

claims of infringement.[36] Accordingly, Citrix's motion for summary judgment on Communique's claim for injunctive relief is denied.

### III. CONCLUSION

For the reasons contained herein, Citrix's motion for summary judgment that the asserted claims of the '479 patent are ineligible under § 101 is denied, and Communique's motion for summary judgment that the asserted claims are eligible under § 101 is granted.

Further for the reasons contained herein, Communique's motion for summary judgment of direct infringement is denied. Communique's motion to excluded all evidence of prior art is also denied. Communique is not precluded, however, from objecting at trial to the introduction of prior art evidence that was, or could have been, introduced during reexamination.

Citrix's motion for summary judgment on Communique's claim for induced infringement is granted, and Citrix's motion for summary judgment on plaintiff's claim for willful infringement and injunctive relief is denied.

**IT IS SO ORDERED**.

Dated: December 21, 2015

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[36] Even if Communique proves infringement, the Court would be required to determine if the balancing test supports a permanent injunction.